# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **CORNELIUS L. LIGHTFOOT,** | ) |
| Plaintiff, | ) Case No. 7:21CV00253 |
| v. | ) **OPINION AND ORDER** |
| **BARTLEY, ET AL.,** | ) JUDGE JAMES P. JONES |
| Defendants. | ) |

*Cornelius L. Lightfoot, Pro Se Plaintiff; D. Patricia Wallace, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE & PUBLIC SAFETY DIVISION, Richmond, Virginia, for Defendants.*

The plaintiff, Cornelius L. Lightfoot, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 against four correctional officers following the use of a canine against him. After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted.

I.  BACKGROUND.

A.  Lightfoot's Version of Events and Claims.

On November 10, 2020, as inmates were reentering their housing unit after outside recreation through the vestibule, Lightfoot set off the metal detector.[1] He alleges that the machine alerted to metal screws placed in his right leg after a gunshot

---

[1] This summary of Lightfoot's account is offered in the light most favorable to him, based on his verified Complaint, ECF No. 1, and his affidavit, ECF No. 30-1, offered in support of his response to the defendants' motion.

wound. As Correctional Officer E. Bartley conducted a pat down search, Lightfoot remembered that he "was in possession of some chewing tobacco he found outside and his stinger," a device used to heat water. Compl. 4, ECF No. 1. He knew that if Bartley found these items, he would charge Lightfoot with disciplinary infractions. So Lightfoot grabbed the items and threw them into a secondary vestibule, where another inmate retrieved them. Meanwhile, Bartley ordered Lightfoot to the floor and called for assistance.

Lightfoot alleges in the Complaint that once he tossed the contraband away, he "layed [sic] on the floor in complete submission on the floor hands behind his back." *Id.* at 5. In his later affidavit response, Lightfoot changes this story a bit, saying that he "put his hands out and allow[ed] Defendant Bartley to place him to the ground. At which time [Lightfoot] was sitting on his bottom with his hands out. Defendant Bartley ordered [him] to roll over on his stomach, at which time he complied. Putting his hands behind his back." Opp'n Summ. J. Lightfoot Aff. 1, ECF No. 30-1. Lightfoot alleges in the Complaint that Correctional Sergeant J. Massingill held his torso, while Correctional Officer Josh Bise put restraints on the inmate's legs. Lightfoot also alleges that he heard someone say, "That's Lightfoot Grievance Filing Ass Put the dog on him." Compl. 5, ECF No. 1. Lightfoot now believes Massingill made these statements. Opp'n Summ. J. 3, ECF No. 30. According to Lightfoot,

> K-9 Officer Baker was pulling on the door requesting that the booth officer open the 4, 5, 6 outside vestib[u]le door. At which time Defendant Baker runs straight in, without warning and deployed his K-9 on [Lightfoot]. Once the K-9 attacked, is when both officers jumped back off [Lightfoot] (to insure as to not get bit themselves.)

Lightfoot Aff. 1, ECF No. 30-1. Lightfoot states that he "at no point moved, struggled or resisted . . . before the point of Defendant [Canine Officer] Baker['s] K-9 attacked. More officers entered the vest[u]ble soon after."[2] *Id.* Lightfoot alleges that "Baker allowed his K-9 to chew on [Lightfoot's] right thigh area causing [him] immediate pain [and] multiple puncture wounds." Compl. 6, ECF No. 1. Lightfoot claims that the dog chewed "on [his] leg for what seemed like forever." *Id.*

As a result of the dog attack, Lightfoot allegedly suffered nerve damage and experiences tenderness and tingling in his thigh when standing or walking. He also alleges experiencing mental distress whenever he sees a dog.

Lightfoot filed his § 1983 Complaint in April 2021. Liberally construed, his pleading asserts the following claims for relief:

1. Baker, by engaging his dog on Lightfoot, used excessive force in violation of the Eighth Amendment and committed assault and battery under state law;

---

[2] Lightfoot's Complaint alleged that other officers arrived in the area before the K-9 engaged. But he states that he realized "after reviewing the video that they came after Lightfoot Aff. 2, ECF No. 30-1. Except for this fact, Lightfoot claims that "[t]he video clearly shows the incident in sync with" the events described in his Complaint and affidavit. *Id.*

2. Massingill, Bise, and Bartley, by holding Lightfoot down during the dog attack without intervening, failed to protect Lightfoot from excessive force, and Massingill and Bartley thereby committed assault and battery; and

3. Baker, at the order of another officer (perhaps Massingill), instigated the dog attack to retaliate against Lightfoot for filing grievances.[3]

As relief, Lightfoot seeks monetary damages and injunctive relief to expunge the disciplinary charges brought against him related to this incident, along with reclassification and transfer to a prison that does not use dogs.

### B. Defendants' Evidence.

The defendants have filed a Motion for Summary Judgment, and Lightfoot has responded, making the motion ripe for consideration. In support of their motion, the defendants rely on affidavits and other attached records and clips of video footage.

On November 10, 2020, at around 10:00 a.m., Bartley was monitoring inmates from A-6 housing unit as they returned from outside recreation through the metal detector in the shakedown area of the unit's vestibule. Officer Bise was monitoring

---

[3] In Lightfoot's response, he also alleges that Massingill later retaliated against him on November 12, 2021, by falsely charging him for vulgar language and disobeying a direct order and placing him in segregation. Resp. 3, ECF No. 30. It is well established that a plaintiff cannot add new claims in his response to a summary judgment motion. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009). Therefore, I do not consider this separate and more recent retaliation claim against Massingill to be properly before the court in this case.

the returning inmates from inside the housing area itself.  As Lightfoot walked through the uprights of the metal detector, its alarm sounded.  Bartley started to frisk search Lightfoot and soon "detected what appeared to be a long metal object that [Bartley] perceived as a weapon.  When [he] tried to retrieve the item, Inmate Lightfoot became aggressive, grabbed [the officer's] arm, and proceeded to pull away" from him.  Reply Mem. Supp. Summ. J. Bartley Aff. ¶ 4, ECF No. 31-1.  Bartley "tried to gain control of Inmate Lightfoot and to retrieve the item," but Lightfoot "began to twist [the officer's] left arm and grabbed the weapon and threw it into the pod vestibule" where another inmate retrieved it.[4]  *Id.*  Bartley then "placed [Lightfoot] on the floor to attempt to gain control over him."  *Id.*

When Bise saw Bartley and Lightfoot struggling, he ran into the shakedown area to help Bartley regain control of Lightfoot.  "Lightfoot continued to resist by pulling away and being aggressive toward [Bartley]" and Bise.  *Id.* at ¶ 5.  Bise tried to place restraints on Lightfoot, but the inmate's behavior and pulling away prevented him from doing so.

Canine Officer Baker was monitoring outside recreation movement that day with his assigned Canine, ET.  When he heard a radio call about an inmate on staff assault in the A-6 pod, he ran with ET to that vestibule to assist.  There, he saw

---

[4] Bartley states that he sustained "bruising and burn marks" from Lightfoot's twisting of his arm. Bartley Aff. ¶ 9, ECF No. 31-1.

Bartley and Bise on the floor trying unsuccessfully to restrain a struggling Lightfoot. Based on the radio announcement and what he saw happening, Baker understood "Lightfoot's conduct as a serious threat to staff safety." Mem. Supp. Summ. J. Baker Aff. ¶ 4, ECF No. 23-1. Baker yelled, "[S]top resisting or I will release the dog." *Id.* Lightfoot "failed to comply with orders." *Id.*

Because the officers were close by, Baker engaged the dog, Canine ET, on Lightfoot's upper right leg and ordered Lightfoot, "State Canine [sic] stop resisting and be restrained." *Id.* As the dog engaged, Bartley and Bise moved out of the way. "Within seconds, when Inmate Lightfoot complied with [Baker's] orders, [Baker] gave Canine ET the command to release and he did so immediately." *Id.* Baker stepped back with ET and told Lightfoot, "[T]hese officers are going to approach you to place restraints on you. Any attempt to resist or assault staff and the canine will respond." *Id.* at ¶ 5. Bise and Bartley then placed Lightfoot in restraints without further incident.

On November 10, 2020, Massingill reported to the A-6 vestibule area only after hearing the radio call of an inmate assault on an employee. He was not yet in that area when Baker engaged the canine on Lightfoot's thigh. Massingill assisted in maintaining control of Lightfoot while other staff members placed restraints on him. Massingill and Officer Mickles then escorted Lightfoot to the medical unit.

Nurse D. Yates assessed Lightfoot in the medical unit on November 10, 2020. She noted that he had three dog bite abrasions on the outside of his right thigh. Lightfoot also complained that the fingers on his right hand were hurting, but Yates did not see any deformity or swelling of his fingers. Yates cleaned "Lightfoot's right leg abrasions with sterile water and then applied ointment to the area." *Id*. at Yates Aff. ¶ 6, ECF No. 23-4. She reports that the abrasions had stopped bleeding by the time she applied the ointment, and a photograph taken of these injuries moments later also reflects no active bleeding. A nurse practitioner examined Lightfoot's right hand and fingers. She buddy taped his second and third fingers and referred him for an X ray of that hand.[5] Records indicate that on November 13, 2020, when staff offered Lightfoot the opportunity to undergo a hand X ray, he opted instead to go to recreation and signed a form refusing that treatment.

After the medical assessment, Massingill assisted in escorting Lightfoot to the Restrictive Housing Unit. Lightfoot was held in that unit under "General Detention status due to assaulting a staff member." *Id*. at Massingill Aff. ¶ 4, ECF No. 23-2. Massingill also understood that staff had observed Lightfoot "to be in possession of what appeared to be a handmade weapon." *Id.* Records indicate that Lightfoot was charged with Disciplinary Code Offense #105A (aggravated assault on a non-

---

[5] "Buddy taping" refers to the practice of bandaging an injured finger to an uninjured one, acting as a splint.

offender) and #102 (possession or use of a weapon).⁶  A hearing officer found Lightfoot guilty on both charges and imposed a $15 fine on one charge and $10 fine on the other.  On appeal, the assistant warden reduced the first charge to simple assault.

## II. DISCUSSION.

### A. The Summary Judgment Standard.

The Federal Rules of Civil Procedure provide that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).⁷  "A fact is material if it might affect the outcome of the suit under the governing law." *Id.*  In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Id.* at 312-13. To withstand a summary judgment motion, the nonmoving party must produce

---

⁶ In the Disciplinary Offense Report, Bartley indicated that while frisk searching Lightfoot on November 10, 2020, he "felt a weapon a sharpened metal knife in the waist band" of the inmate's pants. Massingill Aff., Enclosure B, ECF No. 23-2. Before he could recover the weapon, however, Lightfoot grabbed the item and threw it to another inmate.

⁷ I have omitted internal quotation marks, alterations, and citations throughout unless otherwise noted.

sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.  Lightfoot's Claims under Section 1983.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).  It is well established that only "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  But not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *Id.* at 9.  Where officers apply force in a good faith effort to restore order and discipline, there is no excessive force. *Id.* at 6-7.  Courts also recognize that corrections officials must act "in haste, under pressure, and frequently without the luxury of a second chance." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  Consequently, this court must give prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*, 503 U.S. at 6.

In this context, the court must inquire whether the official, subjectively, applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" and whether "the alleged

wrongdoing was objectively harmful enough to establish a constitutional violation." *Id.* at 6, 8. This subjective inquiry considers "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible official[ ], and any efforts made to temper the severity of a forceful response." *Id.* at 7. To prove the objective component of an excessive force claim, the plaintiff must show more than "de minimis uses of physical force" by the defendant. *Id.* at 10. In short, in considering an excessive force claim, the "core judicial inquiry [is] . . . the nature of the force — specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010).

Law enforcement officers have a "duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002). So "if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and [be] treated accordingly." *Id.* Officials also violate an inmate's constitutional rights if they punish him for filing grievances about prison conditions. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (holding prisoners have a "First Amendment right to be free from retaliation for filing a grievance")

Lightfoot asserts that because he had filed grievances in the past, Massingill told Baker to use the dog on him. Lightfoot also claims that Baker then used excessive force against him by engaging the canine while he was face down and under the control of two officers. Finally, Lightfoot claims that Massingill, Bartley, and Bise violated his constitutional rights by failing to intervene to prevent Baker's use of excessive force.

In response, the defendants have filed declarations, video footage, and other documentation in support of their motion. So, to avoid summary judgment, Lightfoot must present sufficient evidence that could carry the burden of proof of his claims at trial. His submissions must "set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Anderson*, 477 U.S. at 248. "[I]t is well established that a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). "A complaint [or other document] is 'verified' if it is 'signed, sworn, and submitted under penalty of perjury.'" *Id.* at 495 n.2. Lightfoot's Complaint and the affidavit attached to his summary judgment response satisfy these verification requirements.

On the other hand, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe

it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In particular, where the record contains an unchallenged videotape capturing the events in question, the court must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape. *Id.*; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

Lightfoot does not challenge the validity of the video footage or the accuracy of its depiction of events on November 10, 2020. Rather, he contends that I should deny summary judgment, because the video does not contradict his version of events.

I have carefully reviewed the surveillance footage of the altercation between Lightfoot and the officers, a video camera recording of Lightfoot being assessed and treated by medical staff and escorted to segregation, and a photograph of his dog bite injuries after the nurse cleaned and applied ointment to them. The running timer on the video footage of the shakedown area reflects that the entire incident at issue in Lightfoot's claims occurred in less than one minute.

Starting at about time 10:09:12, Lightfoot walks through the metal detector, sets off the alarm, and saunters over to Bentley to be frisked. After Bartley pats Lightfoot's waist, the two appear to be talking for a couple of seconds. Lightfoot then grabs Bentley's arm, struggles away from him, and charges toward the door leading out of the shakedown area into the outer vestibule and the housing area.

Meanwhile, Bentley grabs and holds onto part of Lightfoot's clothing and pulls him back into the shakedown area. Again, Lightfoot runs away from the officers and toward the door, but Bentley pulls him back. Another video clip of the same time period shows that during this altercation, at about 10:09:30, Lightfoot tosses his contraband into the outer vestibule where another waiting inmate retrieves it.

Once the contraband is gone, Bentley grabs Lightfoot around the waist and swings him toward the floor. But Lightfoot physically resists Bentley's efforts. By 10:09:34, Lightfoot is sitting on the floor on his behind with his legs straight in front of him, his feet braced against the inside uprights of the metal detector, his arms outstretched. He continues to struggle as Bentley tries to place him face down on the floor. Bise runs into the area at about 10:09:38, grabs Lightfoot's left arm, and helps Bentley turn him to lie on his stomach on the floor.

Baker enters the shakedown area with his canine through an open door from the recreation yard at about 10:09:41. Baker pauses for five or six seconds, watching Bentley and Bise trying to place handcuffs on Lightfoot, who is wriggling on the floor. While the officers' bodies partially block the camera angle, a frame-by-frame view of the footage reflects that Lightfoot is still moving his upper body and preventing application of the restraints.

At approximately 10:09:47, Baker engages the canine on Lightfoot's right upper thigh. Bentley and Bise roll almost instantaneously away from the inmate,

who is on his stomach with his hands behind him. After three to four seconds, Baker and the dog back away from Lightfoot. He is now lying still with his hands clasped behind his back. At about 10:09:54, two other officers enter the shakedown area through the outside door and stand by, observing. Officers then place handcuffs and shackles on Lightfoot with no further issues.

The video footage of Lightfoot in the medical unit includes audio. The viewer can clearly hear Lightfoot say that he was attacked by the officers while he was in handcuffs and shackles.

Contrary to Lightfoot's assertions, I conclude that Lightfoot's account is so blatantly contradicted by the video that no reasonable jury could believe Lightfoot's version of the incident. The surveillance video clearly contradicts Lightfoot's claims that Massingill was present when the canine engaged on Lightfoot's leg. The video shows that only Baker, Bentley, and Bise were in the shakedown area when the dog engaged. Thus, I conclude that no reasonable juror could believe Lightfoot's allegations that Massingill urged use of the dog to retaliate against Lightfoot for filing grievances or that Massingill held the inmate down during the canine encounter. *Id.*

The video also directly contradicts Lightfoot's contentions that Baker was prevented from entry by a locked door and that Baker engaged the dog without warning. As indicated, the video reflects that Baker entered through an open door

from the rec yard and did not immediately engage the dog. Rather, Baker paused for a few seconds as Bartley and Bise continued their attempts to control and handcuff Lightfoot. The video also shows that contrary to Lightfoot's allegations, he was moving his upper body about as the officers struggled unsuccessfully to keep control of his hands and apply handcuffs.

The video clearly indicates that Bartley and Bise did not hold Lightfoot down when Baker engaged the dog, as Lightfoot has claimed. Rather, the officers rolled or stepped away from Lightfoot in almost the same instant that the dog engaged. According to the video timer, Baker took the dog off Lightfoot's thigh after no more than four seconds, contrary to Lightfoot's claim that the officers maliciously allowed the dog to chew on his leg for a long time to punish him. The photographs and medical records about Lightfoot's injuries also contradict his claim that Baker misused the dog to punish him. Rather, this evidence indicates that the injuries Lightfoot suffered were small abrasions that had already stopped bleeding before the officer photographed them and required no stitches or ongoing treatment.

Lightfoot faults Bise and Bentley for failing to tell Baker to hold off the canine — that they had the inmate under control and did not need assistance. Indeed, Lightfoot states on the audio in the medical unit that he was already in handcuffs and shackles when Baker engaged the dog. On the contrary, the surveillance video reflects that Lightfoot was not restrained at all and that he did not stop moving his

upper body until the dog encounter. Only thereafter was an officer able to apply handcuffs to Lightfoot's wrists and later to apply shackles to his ankles.

In short, the unchallenged video footage soundly contradicts nearly every facet of Lightfoot's constitutional claims of retaliation, excessive force, and bystander liability. After carefully viewing the footage, no reasonable jury could find that any of the defendants used physical force or the canine "maliciously and sadistically to cause harm," as required to state an Eighth Amendment excessive force claim. *Wilkins*, 559 U.S. at 39.

Rather, the video indicates that Lightfoot's decision not to surrender his contraband to Bartley and to grab the officer's arm started the brief sequence of officer actions taken to apply force in a good faith effort to bring Lightfoot under control and restore the security of the area. The officers' actions as depicted in the video and their affidavits reflect that they meet the elements of the *Hudson* analysis. 503 U.S. at 5–7. Bentley saw a need for the application of force to attempt confiscation of Lightfoot's contraband, to keep him from running into the pod with it, and to bring him into control after his disruptive and assaultive behavior. All the officers reasonably perceived Lightfoot's assault on Bentley and his attempts to evade him as a threat to the safety of staff and other inmates. Bartley and Bise used hands on force to seek control over Lightfoot and place him in a position to allow safe application of restraints. When their actions did not quickly persuade Lightfoot

to comply with their orders, Baker engaged the canine briefly, until Lightfoot did lay still. At that point, Baker called off his dog, as reflected by the minimal nature of Lightfoot's bite injuries. This evidence shows the officers' efforts to temper the use of force and to use no more than necessary to control and restrain the disruptive inmate and restore security. Furthermore, since the video contradicts Lightfoot's claim that the officer used or allowed the use of unnecessary force under the circumstances to punish him, the video also contradicts Lightfoot's claims of bystander liability against Bartley and Bise for not stopping Baker from using his dog. *Randall*, 302 F.3d at 203.

Lightfoot asserts that by resorting immediately to using physical force and a canine, the officers violated internal VDOC policies governing these issues. He claims that, per policy, the officers should first have used other forms of force to address his intransigence, such as rounds fired from a control booth or the application of pepper spray.

As the court directed, the defendants have submitted to the court, in confidence, the policies to which Lightfoot refers, VDOC Operating Procedure (OP) 420.1, Use of Force, and OP 435.3, Canines.[8] The court's review of these procedures

---

[8] In discovery, the defendants provided evidence that allowing a VDOC inmate or members of the general public to possess these security policies could cause irreparable harm to VDOC efforts to maintain safety and security at its facilities. Therefore, the court ordered that the policies should be provided for the court's review only at this stage of the proceedings.

reflects no mandate that officers may use hands on physical force or a canine only after they have used control booth munitions or pepper spray to address an inmate's violent or disruptive behavior.

In any case, failure to follow state policy, without more, does not establish a constitutional violation. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state"). Thus, even if one of the defendants had violated a state procedure or regulations, that violation is not actionable under § 1983.

For the stated reasons, I will grant the defendants' Motion for Summary Judgment as to Lightfoot's constitutional claims.

### C. The State Law Claims.

Lightfoot asserts claims of assault and battery under state law against three of the defendants. Under Virginia law, a battery is "an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). An assault is "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Id.*

> In Virginia, [a] plaintiff's assault or battery claim can be defeated by a legal justification for the act. . . . Virginia law recognizes that police officers are legally justified in using reasonable force to execute their lawful duties. *See, e.g., Pike v. Eubank*, 197 Va. 692, 90 S.E.2d 821

(1956). Accordingly, if reasonable force is used by police officers in execution of their lawful duties, they are immune from suit for such acts.

*Guerrero v. Deane*, 750 F. Supp. 2d 631, 658 (E.D. Va. 2010), *aff'd sub nom. Guerrero v. Moore*, 442 F. App'x 57 (4th Cir. 2011) (unpublished). Thus, a law enforcement officer whose challenged actions are otherwise lawful cannot be liable for claims of assault and battery based on those actions.

As discussed above, the video footage in this case contradicts completely Lightfoot's constitutional claims that Bartley, Bise, and Baker used excessive force in handling him on November 10, 2020. Because no reasonable juror could find their actions unlawful as he alleges, I also find that they cannot be liable for assault and battery under Virginia law. I will grant the defendants' Motion for Summary Judgment as to Lightfoot's state law claims.

### III. CONCLUSION.

For the stated reasons, it is **ORDERED** that the defendants' Motion for Summary Judgment, ECF No. 22, is GRANTED.

A separate Judgment will enter herewith.

ENTER: September 15, 2022

/s/ JAMES P. JONES
Senior United States District Judge